**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT OWEN TAYLOR,

Defendant - Appellant.

No. 03-5163

(N.D. Oklahoma)

(D.C. No. 02-CR-171-K)

**ORDER AND JUDGMENT** *

Before **TACHA,** Chief Circuit Judge, **ANDERSON** and **BALDOCK** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Robert Owen Taylor filed a motion to suppress evidence, claiming the gun he had thrown out of the car he was driving was obtained by police in violation of the Fourth Amendment. Following a hearing, the district court denied the motion. Taylor then entered a conditional guilty plea to a charge of possession of a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and was sentenced to sixteen months' imprisonment, followed by three years of supervised release, and assessed a fine of $1000. As permitted by the plea agreement, Taylor now appeals the district court's denial of his motion to suppress. For the reasons set forth below, we affirm.

## BACKGROUND

At approximately 2:30 a.m. on June 30, 2001, a Sunday morning, Tulsa Police Department officers arrived at the parking lot of the Northridge Shopping Center in Tulsa, Oklahoma, in response to a call from the Shopping Center's owner, Thomas Riley. Riley asked the police to help him clear the parking lot of loiterers who did not have business at either of two Shopping Center establishments (a restaurant and a community center) that remained open at that

time.[1]  The police made an announcement on their public address system, directing those present who were not at the restaurant or the community center to return to their vehicles and head for the exits.  The police located their police cars behind the mass of people present, and as vehicles moved towards the exit, the police slowly followed behind them.

According to the hearing testimony of Officer Hart, one of the police officers present, Taylor, who was driving his girlfriend's Cutlass while she sat in the passenger seat, initially got "sort of in line" to leave the parking lot.  Order at 5, R. Vol. I, tab 19.  For reasons not disclosed by the record, another police officer, Officer Moyer, whose police car was directly behind the Cutlass, turned his car's spotlight on.  At that point, Taylor left the exiting line of cars and "headed toward the northeast corner of the parking lot, where no businesses were open at the time."  Id.  Officer Moyer and Officer Hart, in separate cars, followed in pursuit with their lights and sirens on.  Taylor then turned around and drove south, passing the restaurant, and reached the far southeast corner of the parking lot.  Officer Hart testified that the Cutlass reached a speed of thirty-five miles per hour while passing pedestrians near the restaurant.  As Taylor brought the Cutlass

---

[1]The record indicates that it was not uncommon for people to congregate in the Shopping Center parking lot on weekend evenings and for police to help clear the parking lot if a disturbance occurred.  In this instance, Riley testified that he called the police after someone had tried to run him over.

to a stop in the southeast corner, from which there is no exit, he threw a gun out of the passenger window. Police recovered the gun, a loaded 9 mm Ruger, approximately five feet away from the passenger's door and estimated that the vehicle had moved two to three feet after the gun was thrown, in the course of stopping. After finding that Taylor had previously been convicted of a felony, police charged him with violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2), as noted above.

> Ruling on Taylor's motion to suppress, the district court held that
>
> Defendant's actions of initially complying with the officers' orders, which he had no obligation to do if he was, in fact, conducting business at the [restaurant], and then getting out of the exit line and pulling behind the officers to an area of the parking lot that had already been cleared by the officers and where no businesses were open, leads to a reasonable suspicion of criminal activity. As such, the officers were justified in pursuing and eventually stopping the Defendant.
>
> . . . . Therefore, when Defendant threw the gun out of the passenger window as he was coming to a stop, he effectively and voluntarily abandoned the gun.

Order at 5-6, R. Vol. I, tab 19 (footnote omitted). Holding that the police's seizure of the gun was thus reasonable under the Fourth Amendment, the district court denied Taylor's motion.

On appeal, Taylor argues that the police lacked reasonable suspicion to stop him and that the district court therefore should have held the seized gun inadmissible as fruit of the poisonous tree.

**DISCUSSION**

"In reviewing a district court's denial of a motion to suppress, we accept the district court's findings of fact unless they are clearly erroneous." United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002). "We review *de novo* the ultimate question of whether a search or seizure was reasonable under the Fourth Amendment." Id.

As an initial matter, we reject the government's argument that the district court should have denied Taylor's motion for lack of standing because Taylor failed to assert a possessory interest in the gun prior to the government's presentation of evidence. We have held that "a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned" because he has no expectation of privacy in the property. United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir. 1997) ("'The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the [discarded] object.'" (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir. 1983))). However, this rule only applies where the abandonment did not result from an earlier Fourth Amendment violation. "[A]n abandonment that results from a[n earlier] Fourth Amendment violation cannot be voluntary," and the police's seizure of property involuntarily abandoned is unreasonable as a

matter of law. United States v. Austin, 66 F.3d 1115, 1118 (10th Cir. 1995); see also United States v. Hernandez, 7 F.3d 944, 946-47 (10th Cir. 1993).

Here, Taylor claims his abandonment of the gun was involuntary because it resulted from the police's unreasonable seizure of the Cutlass. It is undisputed that Taylor, as the Cutlass's driver, has standing to challenge his own seizure during the stop of the Cutlass. We therefore consider first whether the Cutlass, and thus Taylor, was seized at the time Taylor threw the gun out the window, and, if so, whether that seizure was reasonable. Only if we determine that no prior Fourth Amendment violation occurred would the issue of standing in regard to the gun's seizure come into play. Here, of course, Taylor asserts no retained expectation of privacy in the gun. Thus, we will hold the government's seizure of the gun reasonable as long as we conclude that Taylor's abandonment of the gun was voluntary.

We first consider whether Taylor was seized at the time he threw the gun out of the car window. A seizure occurs where a defendant submits to the assertion of authority by the government. California v. Hodari D., 499 U.S. 621, 626 (1991). Here, the government argues there was no assertion of authority because the police officers, pursuing Taylor with their sirens and flashing lights on, "did not intend to seize" Taylor but "merely wanted him to leave" the parking lot. Appellee's Br. at 10. The government cites nothing in the record in support

of this proposition, and we believe a police car's flashing lights and sirens provide a clear direction to stop.

The government next argues that Taylor's stop was not an act of submitting to the police's assertion of authority but rather resulted from his "trapp[ing] himself in a corner of the parking lot from which he could not escape." Appellee's Br. at 11. At least part of the reason Taylor was trapped, however, was that the pursuing police cars did not allow him to leave the corner of the parking lot once he got there. We believe making a distinction of the sort the government suggests would be drawing "too fine a line." Brower v. County of Inyo, 489 U.S. 593, 598 (1989).

The government finally argues that Taylor was not actually stopped at the time he threw the gun out the window. The district court found that Taylor threw the gun "as he was coming to a stop." Order at 6, R. Vol. I, tab 19. Given Officer Hart's testimony that the car moved only two to three feet after the gun was thrown and that the gun was found within seven feet of the car, we do not consider this finding clearly erroneous. We do not consider the two- or three-foot gap between throwing the gun and coming to a complete stop significant in light of the inevitable mechanical delay between Taylor's decision to stop and making his vehicle fully comply with that decision.

We therefore hold the Cutlass and Taylor were seized at the time Taylor threw the gun out the car window.

We next consider whether the seizure of the Cutlass was reasonable. In performing this analysis, we "examine the events that occurred leading up to the stop to determine whether the 'historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause.'" United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). A stop is valid if "'this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" Id. (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (citation omitted)).

Here, the district court determined the police had "a reasonable suspicion of criminal activity" without reference to any specific violation of law. Order at 6, R. Vol. I, tab 19. We have previously reversed a denial of a motion to suppress where there was no "specific factual basis for suspecting that a *particular crime* was being committed by [the defendant] at the time he was detained." United States v. Davis, 94 F.3d 1465, 1470 (10th Cir. 1996) (emphasis added). We need not consider whether the court's ruling warrants reversal on that basis here, however, because we believe the factors listed by the district court in support of

its ruling gave the police reasonable suspicion to believe Taylor was violating the City of Tulsa trespass ordinance. The ordinance defines the offense of trespassing as "[r]emaining upon the premises of another, whether public or private, and refusing to leave the premises forthwith after demand by the owner or occupant," or, alternatively, "[r]emaining on private property at any time other than during posted hours of business operation after having been directed to vacate such premises by a police officer." Tulsa, Okla., Penal Code, tit. 27, § 2106(E) & (G). In this case, police officers, at the request of the property owner, gave the order to all those in the Shopping Center parking lot who were not using either of the two open businesses to leave. We agree with the district court that Taylor's initial compliance with the police officers' direction to leave the parking lot gave the officers reason to believe he was not using an open business and thus had no legitimate reason to remain on the property. When Taylor then left the exit line and drove toward an area of the parking lot where no businesses were open, the officers had reasonable suspicion to believe he was unlawfully trespassing.

Taylor argues that his actions could as easily have been understood as "both innocuous and understandable" as the result of his unfamiliarity with the area and his desire "to leave without having to deal with the police." Appellant's Br. at 9. However, we have previously explained that "an officer with reasonable suspicion

need not 'rule out the possibility of innocent conduct' as long as the totality of the circumstances suffices to form 'a particularized and objective basis'" for a stop. Vercher, 358 F.3d at 1261 (quoting United States v. Arvizu, 534 U.S. 266, 277-78 (2002)). We believe the totality of circumstances here is sufficient to give officers reasonable suspicion of trespass.

We thus hold that the stop of the Cutlass was reasonable and that Taylor's abandonment of the gun was therefore voluntary. Accordingly, the police's seizure of the gun did not violate the Fourth Amendment.


**CONCLUSION**

For the foregoing reasons, the district court's denial of Taylor's motion to suppress is AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge